Good morning, Your Honors. Gretchen Fusilier on behalf of Lourdes Duenas. Good morning. Mr. Ebert and I are sharing the 20 minutes allotted to both of our cases. We will take 10 minutes each and reserve 3 minutes each for our rebuttal. If it please the Court, may I also say that I'm going to address the remedy of suppression and Mr. Ebert will address the Fourth Amendment issues. Suppression, we submit, of all of the evidence seized during the search of the premises in Guam on April 19th, is the appropriate remedy to implement the Fourth Amendment's prohibition against unreasonable searches and seizures, the violation of the sanctity of private property, as well as the assistance of the media, which turned the search, the valid search, into an invalid general search. There is a lot... Do you really have to look at whether the media's presence expanded the scope? Your Honor, I believe... I mean, I'm trying to get right to the issue since you've limited yourself to 10 minutes. Yes, and Mr. Ebert will address that issue in more depth, perhaps, but... Oh, he's got that issue. I'm sorry, I don't... I do believe that the media's presence expanded the search. If we look at the... What evidence do you have that the media touched, moved, handled any evidence, or encroached into areas of the house that were either curtilage or the home itself? Your Honor, the testimony is unclear. What we do know is that the Guam police officers gave the media a tour of the premises that were searched. However, I want to express the fact also that the media had to trespass onto private property in order to be present at the scene of the search on that date. The government, in its brief, in its answering brief at page 15, concedes the fact that the media were on the property without the permission of the property's occupants, photographing and conducting other affairs. However, having said that, the government attempts to overcome the trespass issue, which the U.S. Supreme Court has consistently indicated would violate or avoid any search because of the sanctity of the individual's property. Well, then all you're suggesting is there's no evidence that the media touched anything, there's no evidence the media did anything with the evidence, they didn't aid in the search, they didn't discover any evidence, they didn't develop any evidence. The best you can say is what they did was photograph it when they shouldn't have been there. Well, more than that, Your Honor, they published the pictures in the local media. Well, I understand that, but we don't have anything about changing where we're going to have the venue. All we're talking about, I'm trying to get down what it is they really did, because it seems to me there's two prongs you have to go to here, the twin aims of why I would exclude. One is deterrence, and another is judicial integrity, and I guess I'm trying to limit it then to what I've got in front of me to make that determination. I've argued that the media did expand the search because by their publication, first of all, the search warrant was not to solve stolen property issues and was not authorized to retrieve and seize stolen property. The media photographed property that was staged by the Guam police officers and premised on the idea that it was stolen, published the pictures with that characterization. The expansion of the search into stolen property would vitiate the authority of the specific search warrant, according to our theory. I would also go on to say, well, may I ask the Court, part of the theory that I am arguing is the violation of the sanctity of the private property, although the government indicates that there is no expectation of privacy in the property because of the stolen property. The stolen property was not the basis of the search warrant. Was the stolen property introduced at the trial? Yes, it was, indirectly, because Michelle Jong testified as an expert for the government. Relying on the photographs of the stolen property that had been staged for the media, indicating that drug trafficking charges usually are linked to large quantities of stolen property. Were you trying to, did you argue to the judge that the stolen property, the photos of the stolen property should be excluded? That was part of the general suppression motion brought by Mr. Duenas and joined by Ms. Duenas. I'm having trouble discerning from your briefs what specific property you wanted, or evidence you wanted excluded as your remedy for the media circus. I believe that the remedy is to exclude all property,  one which evidence does not actually indicate that it was stolen or all of it was stolen, as well as the drugs and the guns that were introduced during the trial. And did your motion include the safe? It did include the safe as well, Your Honor, and the contents of the safe. Did the media discover any of the drugs or any of the alleged stolen property? There was not specific evidence or testimony during the trial to indicate that. You made a motion to suppress certain things, and I'm trying to figure out what it is that you're trying to suppress, and who is the person that violated the Fourth Amendment by seizing it? Yes, Your Honor. May I just say that I was not trial counsel. I'm only the appellate counsel. Not only, but I am the appellate counsel. The suppression motion sought to suppress all of the evidence seized based on a violation of the Fourth Amendment, including the safe, the guns, everything that was staged for the media to photograph. Does that address your question? Really, the base of my question is, is there any evidence in the record that the media discovered evidence that you sought to support, that the defendant sought to suppress in this case? No, there is no evidence in the testimony at trial, and the position of the government is that the media did not discover any drug or other evidence. Well, I'm not so worried about the position of the government as I am yours. That's why my colleague's question is important. That's why I thought. I mean, I didn't see that you said any place that the media discovered anything, developed anything, or aided in the search. No, Your Honor. However, when you look at the case of Wilson v. Lane, which Mr. Ebert will discuss, that case did find that the mere presence of the media at the search premise, on the search premises, was a per se Fourth Amendment violation. And I see that I have used most of my allocated time, and I would like to reserve at least two minutes for rebuttal. Unless there are no more questions, I will defer to Mr. Ebert. Thank you, counsel. Good morning, Your Honors. May it please the Court. I'm Mark Ebert for Mr. Raymond Buenas. In a way, I join, of course, in Ms. Fusilier's arguments, and she joins in mine. We filed written joinders. In a way, we're arguing kind of alternative theories here, because we have a paucity of case law, which is in fact ambiguous in terms of Wilson v. Lane's footnote on suppression, and we have what I believe are kind of inconsistent arguments by the government as to what the media was doing there, how they got there, and what their role was. But I'm going to try to address some of the questions that the Court just asked.  The media's mere presence at the scene of the search, even if they did not participate in the search and were not there for any police purposes, is a per se violation of the Fourth Amendment. Right, so we're assuming here what we're trying to find out is whether what we're trying to address is whether exclusion of the evidence was the appropriate remedy. But you see, the only case law on that, and what the Court's been referring to, is the Eleventh Circuit case of Hendrickson, which starts out by saying, you know, there's an ambiguous footnote here. We don't know what it means, but we're going to interpret it one way, which is that the media has to assist in the search and find certain items. Or otherwise taint, disturb, touch, whatever. Right. Do something. And my first argument is that Wilson v. Lane creates a Fourth Amendment violation, which is per se, if the media is there. If the Court goes along with Hendrickson, then it creates a violation that has no remedy. And I think that the first argument is that the Court should not agree with Hendrickson, the Eleventh Circuit case. Doesn't 1983 give a remedy for a Fourth Amendment violation? No, Your Honor. This is a violation of a criminal right under the Fourth Amendment to the Constitution, a violation of a criminal search warrant, and therefore the remedy has to fit the violation. It really doesn't do Mr. Duenas a lot of good if he's in prison for 20 years, based on illegally seized evidence, to say, okay, well, you can sue the government, or you can sue the police for that, even if convicted drug dealers had any realistic chance of suing the police. But if the idea is to punish the media for being involved in the search, wouldn't monetary damages be some compensation for that? The presence of the media violated the Fourth Amendment because the police allowed them to be there. And it was the police that violated the Fourth Amendment by allowing the media onto the property to trespass, to sit in the front yard of the property to bring out all the evidence into what the police called the staging area, and then put the media in the staging area to see all this. It was the police that violated the Fourth Amendment. And the warrant does not authorize the media or anybody else to be present on the property. Certainly that would go to the judicial integrity and deterrence aspect of it, which is that the warrant said what it said, and it said the police can go in and search. And so I've answered Judge Allecon's question as well. If you're referring to my question earlier, did the media do any searching here? They didn't search. However, they did expand the scope of the warrant, which is kind of an alternative argument. I don't think they need to. I think if they're merely present and the police allow them to be there under Wilson v. Lane, that's enough for a per se violation and there has to be a remedy. And therefore, I would urge the court not to go along with the Eleventh Circuit and Hendrickson. But they did expand the scope of the warrant in several ways. First of all, they didn't just sit in the staging area and look at the stolen property. Now, as my co-counsel points out, the stolen property was not the subject of the warrant. The warrant was for methamphetamine, and to the extent that it authorized searches for things related to the methamphetamine, it was very specific, stocks, bonds, cash, things like that. But the media also was taken away from the staging area. They were given at least three tours by the police. The chief of police took them to the crime scene. We don't know exactly where that went. One officer took them to an area behind the house to a marijuana patch. Another officer took them up a 150-foot jungle trail into the jungle to a different marijuana patch. Another officer took them to where the swap team was. In other words, they were going all over the place. They were looking at marijuana, which was not the purpose of the warrant, and they were publishing, as Ms. Fusilier said, pictures in the search. And that expanded the scope of the search. I don't think that's necessary under Wilson v. Lane to have a remedy, and the remedy has to be suppression because there is no other remedy for the police violation here. But if you want expanding the scope, I think we have that. And yes, we did move to exclude all of the evidence because of the police violation. Are you going to spend all your time on this media issue, or are you going to get to the interrogation? Yes, I can do that right now, Your Honor, if that's what the court pleases. The government has the burden of proof both on the voluntariness of a confession and on the question of a waiver of Miranda rights. Here the DEA agent, Agent Jong, and Officer Smith tell conflicting stories. Agent Jong says that she told Officer Smith that Mr. Duenas had requested an attorney, and Officer Smith denies that. He says, she never told me that. Well, let's just skip that. Suppose that Officer Smith knows that she requested an attorney because Jong knows she requested one. Right, correct, Your Honor. Let's get there. I mean, we've got an officer who's coming into a situation, and he says, how are you doing, Ray? Now, it seems to me that the term interrogation under Miranda would refer not only to express some questioning, but also that the words or the actions on the part of the police, that the police should somehow know that what they're going to say is going to cause the person there to start to spill his guts. Now, in this particular situation, the poor policeman saw the person at the hospital. Duenas knew how involved the policeman was in this particular situation, and he knew he'd invoked right to counsel previously. How is Officer Smith to know that he's going to just start spilling his guts just because he says, how are you? There are four reasons related to what is an interrogation that supports my argument. Well, I guess I want you to focus on what part of those because that's what I'm focusing on. Right, and actually I think all four of them do address what you're asking, but the first is what was the purpose of his going in there, and both Officer Smith and Agent Jong were consistent that he was sent in there to get him to talk. And secondly, there's the question of whether they had knowledge that he was susceptible to talking to Officer Smith, and again, that's something that both Agent Jong and Officer Smith agreed with because he was an old friend, and that was why he was sent in, because he was an old friend. The third thing is that interrogation doesn't include just words. It includes actions which are designed to make the person talk. Well, I appreciate that. So you're saying just merely sending someone who is a friend of the victim is enough? Not in all circumstances, but in these circumstances where they believed and intended that sending him in there would get him to talk, I would say yes, and remember that the result was exactly what they intended, which is that he did talk. Well, there's no question, however, that even before he started saying anything, he gave him his waiver of rights again. But I guess my worry is that you're jumping immediately to the conclusion that simply because a police officer has dealt with this person before and goes in and says, how are you, nothing more than how are you, that immediately he's interrogating him, even though he gave him his rights before he let him say anything. No, I'm not jumping to that conclusion. That's broader than what I'm saying. I'm saying that in these circumstances where he knew that this person was susceptible to talking to him because he spoke in the hospital, where the agent thought that, yes, he invoked his rights, he wouldn't talk to the agent. So could he have gone into this interrogation room? Would it have been appropriate for him to walk in at all? Or are you really arguing that he had to walk in and immediately say, here's your waiver of rights before I even say how are you? I'm arguing that he walked in intending to get him to talk. And he started out, yes, he started out with how are you, which is, you know, in other circumstances would not necessarily be something that they would expect would make him to start to talk. But he talked immediately, and that was the purpose. That was the effect. He had knowledge that his presence would be likely to make him talk, and he, in fact, made him talk. Would you make the same argument if the officer had come in and said hello? I think that if he had come in – I think that under these circumstances – and, in fact, the district court, in a footnote of his opinion, said that he suspected that anything he said at that point would have convinced Mr. Duenas to talk. And I think that probably is true, and that's why they sent him in. But, you know, you can't just say, you know, I want an attorney, and then have the agent go out in the hall and say he wants an attorney. He won't talk to me. Why don't you go in there and try? And they agreed on that, that that was the reason he went in there. That was not a disputed fact. I don't know if I'm making any headway or not. Well, no, I'm just trying to understand your argument because it seems to me it isn't just a matter – frankly, if we go only on what he asked him, I don't think that's really interrogation. What I'm really suggesting is, in this particular situation, you're saying after he says, I want an attorney, no one from the police department to whom he has any confidence or to whom he has any relationship better go in there because at that point, if he even goes in and says hello and then reads him his rights before he even gets a chance to say anything, that's bad. No, I'm saying that in this particular case, they knew that he was susceptible to talking to Officer Smith. They knew that he had already – Why don't you go into – I mean, you're leaving out a lot of the facts that would give – I'm not saying I agree with you, especially in light of the district court's findings. But, in this case, Smith was in charge of the whole search operation, right? Wasn't he there on the scene? He was some kind of supervisor. He was involved, very involved in this. Their friendship was long past, 10 years past, when he used to work as installers. So he's involved in this, he sees him injured, he goes to the hospital and goes in there and then there's conversation he has with Ray. And Ray starts to say, this is the backdrop to what happened, right? That's right, and I'm sorry if I didn't – You're not explaining – you're not really fully answering those questions. You're correct, you're correct. And I'm not trying to make your best case for you, but there's more there than meets the eye in this situation. The background is that they were all friends and they had spoken at the hospital. Right, and the standard is whether Smith – the interrogation would be whether Smith should have known his conduct was reasonably likely to elicit an incriminating response under the totality of the circumstances. So all of this is really relevant in answering Judge Smith's question. Thank you, Judge Wardlaw. I obviously agree with all that. And I obviously got a better answer, at least from Judge Wardlaw, than what you'd given me. I apologize. I appreciate that Judge Wardlaw was trying to help you with this, but to me the focus is nonetheless on the totality of what we did, when, and whether how are you is enough under the totality to make the burden you have to make. And my – actually, it's the government's burden. Yeah, it's the government's burden. I understand. Oh, sorry, sorry. Your argument. I'm not trying to take the government's burden away. And my time is up. I don't know that I can say anything else. Let me just ask you what I think is my take on the key question, because I think this is a very close question given the totality of the circumstances. But the district court judge made a finding that – he made findings. He seemed to believe Smith over Zhang. He believed Zhang, I think he said. He believed Zhang? I believe he did. That Smith knew? He made a specific finding that he believed Agent Zhang. And Zhang, one of the few differences between their two testimonies was that Agent Zhang said, I told him that he had asked for an attorney. Right. And Officer Smith did not. But I think they both agreed that he was being sent in there because he was a friend and he knew him and was more likely to talk to a friend after having invoked his right to an attorney. So, again, if it's a close question, I come back to the burden of proof, which is the government's. Thank you. Okay. Good morning. May it please the Court. I'm Karen Johnson, Assistant United States Attorney for the Districts of Guam. I might apologize before I start. I'm having a problem with my hearing. And, Judge Bardo, I'm having a hard time hearing you. If you have questions. All right. I'll speak up. Okay. Thank you. May it please the Court. In footnote 11 of the course order, the judge took the government to task for not knowing its case when it told the judge that the media had nothing to do with the search and the seizure of the government's evidence. The order fails to take into account the fact that you have two types of evidence at the Duenas compound. The evidence that was in the Duenas' rooms, by rooms I mean the shack-like structure that consisted of four rooms behind the concrete house, behind the container, and all the rest of the property. The government's case was the guns and the drugs and other evidence found in the Duenas' rooms. The search of those rooms started at 6 o'clock in the morning. The first media representative arrived about 9 and others followed. The media were confined to the common areas of the compound. They had absolutely nothing to do with the search or the seizure of the government's evidence. And the Court did not take that into account. I think it's an important point. Concerning the evidence that was in the rest of the compound, the Court indicated that it felt that the mere presence of the media unlawfully expanded the scope of the search warrant. My challenge to that is why. There's no expectation of privacy in the areas that are common, that are open to public view. Is photographing property even a seizure under the Fourth Amendment in a situation like this? And finally, the defendant has the burden of showing standing. If he's going to object to the photographing of ten generators lined up in his front yard, I think he has to prove that he has a property or a privacy interest in those generators. And, in fact, he did not do that, I suspect because the generators were stolen, as were the some other 2,000 items that the officers found at that place. So I think that the Court reached the correct result, but I think that, in fact, its reasoning was flawed. It failed to distinguish the rest of the evidence from what was, in fact, the government's case. I think the Court also erred in finding that the mere presence of the media anywhere on the property constituted an unlawful expansion of the Fourth Amendment. We don't have much guidance in this area of law. We've got the Lane-Wilson v. Lane, which I think, although it is a civil rights case, I think would, the same analogy, the same reasoning would apply in a criminal case. And we accepted that when we briefed the issue. That had the media been invited in, had they participated in the search, had they set foot in any of the buildings on that property, we would have a very different case. But, in fact, they were confined, they were not invited, they were confined to the common areas, and the only thing they did was photograph property. That cannot, I believe, be a Fourth Amendment violation under any circumstances. I will move on to the voluntariness of the statement. I believe that the Court did not err when it found that the facts of the situation were that Officer Smith went in simply and said, how are you, Ray? They were done with the defendant. He was going to be taken downtown and booked. This was not an unreasonable thing to say to him prior to putting the cuffs on him and taking him down. Did the Court have a question? I believe the Officer Smith said more than, how are you doing, Ray? He also said, are you okay? Are you okay, Ray? How are you doing, Ray? As I recall, his testimony was, are you okay, Ray? And, of course, that's not, given they've been friends, although they've gone different ways in the late 90s, it's not an unreasonable thing to ask, and it's not the sort of statement that's calculated to elicit an incriminating statement. Well, what about in the context of, what about in the context of the fact that, you know, they weren't really, they had been friends once. You keep calling them old friends. That sounds like they're still friends. But he was a law enforcement officer on the scene, and that Ray had earlier in the hospital mentioned that he wanted to talk about the stuff at the house, and then later invoked his right to a lawyer, and then Smith went in and asked about, you know, how are you or whatever. I mean, how do you deal with that context? And a standard, which is whether Smith should have known that his going in at that point would elicit more discussion about the stuff at the house. I think that the reason that he asked how the defendant was doing was because of the scene at the hospital. He knew that he had been hurt. He was transported there. Do you think this or this is evidence in the record? I'm sorry? Do you think this or this is evidence in the record? Well, I think that the reason he asked why the defendant was. . . What's the evidence in the record for the reason he asked? There's nothing in the record. . . Right, so tell us what you think. I mean, we have to go on the basis of the evidence in the record, right? There's nothing in the record as to why he asked the defendant if he was okay, if that's what you mean. He simply went in and asked if he was okay. I don't think that that statement under any circumstances, regardless of the hospital or their friendship, can be considered a statement calculated to induce implementing statements. Let me ask you a question. Is there any significance to this idea that Smith went into the conference room because he believed that Ray had agreed to talk to a Guam police officer but not the federal officers? Is there consequences to . . . I'm sorry? I mean, do you . . . as you understand this record, was Ray agreeing to talk to Guam officers rather than federal officers in what he had to say? Where do we get . . . and where do you get that implication? Yes, I briefed that in my brief. I think that that's his decision. Of course, a defendant can make a decision to talk to one agency and not the other. He may. And from what idea do you get that? From what part of the evidence do you get that idea? Well, the fact that in response to the question about how he was feeling, the defendant's immediate response was, I don't want to talk to the feds, I want to talk to you. So that's the only place we get that except in that particular situation? Well, you have the fact that he had refused to talk to the feds. Michelle John, when she interviewed him or attempted to interview him, laid out . . . Ray says he didn't say that, and that comes . . . you're saying what Smith said. I'm sorry? Ray says he didn't say that he wanted to talk to Smith. That is in the transcript as part of Officer Smith's testimony. It is Smith's testimony, right? Isn't that what he would say in order to get around this? And the other question I have is kind of interesting. If he wasn't intending to elicit statements, why did he go into the conference room with the waiver forms? That's simply . . . Police officers don't just carry waiver forms with them everywhere they go. He walked in there with the waiver forms, and that's in the record. All I can refer to is what the testimony was. He made the distinctions between agencies, and I think there's a reason for that. Well, I guess my worry was, and the reason I'm asking you the question, you suggested that he was on his way downtown immediately, but there's no question from the testimony from Ray or from Officer Smith that if he was intending to go immediately downtown, there was no sense taking in waiver forms. No, I agree, Your Honor. And so, therefore, I'm saying to myself, does the government make this a burden? And if the only place that we have that would suggest that he would talk to a Guam officer rather than federal agents is Smith's testimony, that doesn't the reality of whether that is really what we should believe make a difference on what the district court found about what Smith would say? Well, Officer Smith, you mean does the defendant not understand that he was a Guam police officer? No, I don't mean that at all. What I mean is it seems to me the government makes a big point about the fact that there wasn't even a saying, I won't talk to police officers. All he was saying is he would talk to a Guam police officer, and so, therefore, we ought to look at that. Well, to my book, the only testimony that says that is Officer Smith's testimony. Would you agree? Yes. I mean, the defendant, as Judge Wardlaw has pointed out, never says that. That's right. Does the defendant deny that? Actually, my recollection. Did the defendant deny that? Well, they didn't get it on the stand, they didn't do it. My recollection of the testimony is that he also told Smith that the feds scared him. And, indeed, that is not surprising. Wait, whose testimony was that? That is part of Officer Smith's testimony, Your Honor. Right, again, Officer Smith's testimony. And that's, of course, what he would testify to. And that was his. And then the court had a decision to make. Who would he believe and who would he not believe? And it's my understanding that the court said, I believe when there's any conflict with what happened between police officers, I'd go against Smith. Well, I think you should believe Officer Smith because there is no evidence to contradict his testimony. A statement of the defendant when he files a motion to suppress is not, I believe, evidence that should be considered by the court. And, indeed, the defense even asked Smith whether or not there had been the sort of allegations that the defendant made, and Officer Smith did not. So can I just point out to you that the evidence that Duanus, that Ray testified to, was that he was taken to the precinct after the hospital and first Guam officers started to question him. And the officers were yelling at him, and they were showing him pictures of Franklin Twigg, and they said, all we need to do is catch this guy. And they started to threaten him, said if he didn't cooperate, he'd go to jail for a long time. And then he asked for a drink, and they said they'd see what they could do, and they left. Okay, then the DEA agents come in, and he asserts he invokes his right to a lawyer. Then Smith and Polillo come back in, and they bring a piece of paper, and they told me that they got my wife to cooperate, and it's all on paper. So these stories couldn't be more conflicting about what happened. And then in the context of that, Smith says, I said, hi, how are you? I mean, I don't know where – that's certainly not in Duanus's. I think this was a Guam police case. The DEA was there. They had not yet adopted the case. They tried to interview the defendant, told him about substantial assistance. He had just read out his source and all the people he was dealing with. But this was a Guam police case, and if the defendant was going to be taken down, and he was, of course, in custody, he'd be transported by the Guam police, not by the DEA. Now, that's not in the record, but I think the court and the parties did not dispute that that was so. That's our understanding of how the system works. And that's why they went back in the room, was to transport him. Well, they went back in the room. This section comes in after he's already back at the precinct, and Smith and Polillo had been there first. I'm sorry. Can you put the microphone a little closer? I ordered a new hearing aid, and I have to apologize. I'm sorry. It's just if you get too close to these mics, it gets fuzzy. So what I'm trying to say is they had – we're leaving out of the picture here that Smith, back at the precinct, after the hospital, after Officer Smith and Duenas had talked about the stuff at the house, first they tried to question him, and then they leave saying they'll get him water. But he hasn't said anything to them, nothing. So that was the first conversation. So they leave. Then the DEA agents come in, and that's when he invokes his right to attorney. And then Smith and Polillo come back carrying their pieces of paper, among which we assume are maybe the wife's waiver or the wife's – I think it would be too soon to have a transcript, but waiver forms, certainly the waiver form for him to waive his rights, knowing that he had already invoked his right to an attorney. But there's no testimony. I mean, the waiver of rights form itself? Right. There is no testimony as to where that came from. I think it's a standard form that's available as part of the officer's standard form. Well, there is. First, Duane has declared that they brought a piece of paper, and they told me that they got my wife to cooperate on paper. They then told me to sign a waiver and write down everything they wanted to know, and everything will stop and I'll be all right. Because I wanted everything to stop, I just signed the paper. So the paper came in with the officers the second time they went in. I don't want to belabor this, but, you know. I think that – These are just facts you have to deal with in your argument, and it is the government's burden of proof. I think what the defendant said was rebutted by Officer Smith, and that what exactly happened was exactly what happened. That's when he told Smith he didn't want to talk to him, didn't want to talk to the feds, they got an advice of rights form. They stopped everything right there. And the fact that he was advised of his rights, that was the third time that day, And the fact that he signed the waiver and continued to talk is also evidence of the voluntariness of his statement. Okay. So isn't there a huge Crawford problem in this case? I'm sorry? Isn't there a huge Crawford problem in this case? No, I can't see the problem. What about the use of Smith's testimony from the suppression hearing against Ray at the trial? I'm sorry. I obviously need a new hearing aid. I can understand the other two judges, but I'm having a hard time picking you up. Really? Yes, I am. And everyone else I can hear about. I can understand. I mean, I don't think I speak any more softly than to Dallarpon. I'm sorry? Okay. I will shout. Now you're talking. Okay. The Crawford problem would be the use of Smith's testimony from the suppression hearing at the trial. Are you talking about the fact that he was deceased? Yes. And the admission of that. Yes. I'd like to go on to that, if I may. Good. Thank you. I think that the criteria set out by the briefs is accurate. The defendant had the opportunity to cross-examine Smith. Of course he did. He was on the stand. And the motive to develop the testimony, as I read the defense briefs, I asked if Smith were alive and he were on the stand at trial, what further questions would the defendant have asked? All Smith was doing was repeating what the defendant said. Whether he was coerced, that was covered in the suppression hearing. The only thing left was whether those were the defendant's words or whether Smith had put the words into his mouth. That's obviously a very important part of considering whether a confession is voluntary. They did not ask them that. They did not ask whose words they were. They could have pressed, I think, very strongly on that to imply that, in fact, Smith was the one who made this up and just dictated what the defendant should say. They passed on the opportunity to do that. And so back to their briefs, if Smith had testified at trial, what would they have asked him further that they did not ask him at the suppression hearing? I think that what Smith had at the suppression hearing was the entirety of what he would have testified to at trial. There was nothing more to ask. Well, didn't the lawyer not ask any questions of Smith at the suppression hearing? Yes. So wouldn't there be at least some questions left to ask? Well, what? They asked whether it was coerced, whether a defense statement was coerced. Well, who's they? Ray's defense attorney did not question Smith at all. Presumably on the assumption that, I mean, this was at a preliminary stage, assuming on the assumption he maybe wasn't quite sure how he would attack Smith and his testimony during the trial if his statements were admitted. Maybe he had the strategy in mind. And there's all sorts of things that would lead one to think, given that he didn't ask him any questions, that at trial he would have other questions to ask. They had the opportunity and they had the motive. The point of putting Smith on the stand was to testify that this is what the defendant said. And particularly because all statements were simply repeated in the written statement. It comes down to the admission of the written statement. The defense had the opportunity to question Smith about that statement and in particular what the defendant said because that is relevant to the issue of voluntariness. And they passed on that all together. They had that opportunity. What else are you going to do with Smith other than say, well, you made up these words or you told the defendant what to say? The defense, I think, obviously wants to take advantage of the fact that Smith was deceased, but they've not pointed out as a practical matter what more there was to get out of his testimony, what more they could have raised. And I think that that is evidence that, in fact, they developed everything they could from Smith. I think I'm long past my time. Well, you're not long.  Thank you, counsel. In response to the government's statement that there was no expectation of privacy in the open areas from where the public could view the premises, I'm not sure that this Court will decide this issue based on the sanctity of the premises. However, I would like to point out that the government's statement that there was no expectation of privacy goes against what U.S. Supreme Court cases have held, which recited in the opening brief. The government indicates in its brief that the media was standing in the open areas or could view the premises from the dirt road or where anybody who chose to walk there or drive there could view into the property. However, that's contrary to the evidence presented at trial. The media was not on the dirt road. The police allowed the media into where a search warrant was being executed. That is a very distinctive factual pattern, and we don't believe that that vitiates any privacy interests that the Duenas would have in that property. I would submit it on that. Your Honors, I have a lot of rebuttal. I don't know how much to let this say, so I'll just start. I wanted to address whether you had the same, I don't know if it's in counsel, whether there was a similar motive to cross-examine or elicit testimony from Smith at the suppression hearing as at trial. There was not, and I defer the court to the U.S. Supreme Court case of Wingate. Cited in my brief, at the suppression hearing, the question was simply the voluntariness of the statement. At trial, the issue was guilt, and under Wingate, those are different motives. Also, under the Supreme Court case of, I think it's Supreme Court, of Salerno, the motive that an attorney has is measured by what he actually did. And in this case, he didn't ask those things, and part of the reason he didn't was because the government didn't ask about the substance either. In other words, the government simply said, we're just wanting to ask about what he said only to the extent of being able to show that there was detail, and therefore, detail shows voluntariness. They didn't get into anything about the substance of guilt, which he would have asked them about. So the answer to Judge Wardlaw's question is, both under the case law and under the facts of this case, the attorney simply didn't have, and showed by his actions that he didn't have, the motive to cross-examine him on these important subjects. On the statement issue, there was no evidence that Officer Smith was transporting Mr. Duenas to the cell. In fact, he testified that he came to the precinct, even though he was supposed to be on his way back to the crime scene, and he detoured there when he found out that Mr. Duenas was there. Also, if you look at page 13 of my brief, you'll see that, and I'm citing to the testimony, 2 ER 82-84. After being read his what rights, Mr. Duenas stated he wanted to talk with an attorney first, before talking with them. He wanted to cooperate, but was afraid to because of a prior bad experience with the police. It was the police that he had the prior bad experience with. What did they do? Agent Chong immediately sends a policeman in. The same people who had arrested him, treated him in such a way as to send him to the hospital, who he said were threatening him earlier. It wasn't the fact that he was a policeman, rather than a DEA agent, that caused him to send him in there. It was the fact that he was an old friend. Okay? And in fact, as Judge Wardlaw points out, if actions speak loud-roving words, he did not speak to the Guam police when he was interrogated by them earlier, before the invocation of rights to the DEA. Thank you. All right. Thank you, counsel. United States v. Duenas is submitted,
judges: Alarcon, Wardlaw, Smith N. R.